No. 37,720

FLORENCE HARRAL, *Appellee,* v. THE KENT CORPORATION, a Corporation, *Appellant.*

(212 P. 2d 356)

Opinion filed December 10, 1949.

*H. H. Dunham, Jr.,* of Salina, argued the cause, and *LaRue Royce, E. S. Hampton, John Q. Royce* and *H. G. Engelman,* all of Salina, were with him on the briefs for appellant.

*William B. Ryan,* of Norton, argued the cause, and *Keith G. Sebelius,* of Norton, and *A. W. Relihan* and *T. D. Relihan,* both of Smith Center, were with him on the briefs for appellee.

The opinion of the court was delivered by

PRICE, J.: This is an action for damages for personal injuries sustained by a guest of a hotel, owned and operated by defendant corporation, when she attempted to leave the hotel by a rear door after dark and fell into a ditch outside such door.

The jury answered special questions and returned a general verdict for plaintiff in the amount of $3,500. Defendant's motions for judgment notwithstanding the verdict, to set aside answers to special questions, and for a new trial, being overruled, it appeals.

For a number of years prior to June 28, 1947, the defendant owned and operated the Kent hotel in Norton. It had four outside doorways—one was the main entrance into the lobby, a second was into the coffee shop, a third opened onto the back yard from the kitchen and was for the use of kitchen employees, the fourth, being the one in question, also opened onto the back yard of the hotel and was for the use of hotel employees in carrying laundry from the rooms to the laundry room at the back of the hotel. It will be referred to as the "back door."

Shortly after June 1, 1947, construction work, consisting of replacement of steam pipes, was begun at the rear of the hotel premises and was not yet completed on the date of plaintiff's injuries. A ditch approximately four feet wide and six feet deep, running north from this back door, was dug so as to expose the steam pipes. There were mounds of dirt paralleling the ditch and other obstructions in the back yard.

Plaintiff, a woman fifty-four years of age, testified that in June, 1947, she was living in Nebraska, but came to Norton on either the 26th or 27th and obtained a room on the ground floor of the hotel. She had stopped there on several previous occasions, was familiar with its ground floor layout and various entrances, had used this back door herself on those previous visits and had seen other people, guests as well as employees, use it; that on Saturday night, June 28, about 9:30, she decided to leave the hotel for a cup of coffee, but not considering herself properly dressed to go out through the lobby or coffee shop entrances, where she would have to pass "a lot of people," started down the hall to go out the back door and to a nearby restaurant.

"Q. Go ahead, Mrs. Harral. A. And went out down the hall, the out-

side door, I mean the wooden door, the main door, was open. The screen door was closed. I just walked to the door, opened it, and stepped out—stepped down rather, into this hole or ditch. Terrible sensation, went down through there.

"Q. Now, did you take over one step until you was into that hole? A. No, I didn't take any step at all. I opened the door and stepped right down into this ditch. This ditch, I don't know whether it run up underneath the building or not, but it was up flush with the door, that I know.

"Q. Do you recall as you fell whether you struck anything on the way down? A. I did. I went all the way down. My feet slipped, I went on down further. These pipes, sewage pipes, water pipes, I went on it and went down through those. It was quite some time before I could get out of there. I don't know whether I hollered or not, that I couldn't say, because I was too scared. I had to—I tried to get out, I could just reach the bottom part of the door, I could slip my fingers underneath the bottom of that door, pulled it open, and I pulled on that, got up to those pipes with my knee and body in a little ledge on the bank. I pulled myself up into the hall, then from there on I crawled down to my door, waited a few minutes, I called Mr. Yockers at the desk and he came back.

"Q. Was a doctor called there afterwards? A. Yes, Dr. Cooper was called."

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"Q. I believe you stated you do not recall how long you were down in there, in that hole? A. I really don't know how long I was down in there.

"Q. It has been indicated here before the jury in the opening statement that was made by the defendant's counsel that you unwired a door to get out there. Was that door, that screen door wired shut, fastened in any way? A. It wasn't fastened in any way, because I just walked to the door, put my hand on the door, pushed it open and walked out.

"Q. Was there any resistance to your push on that door at all? A. No, not at all."

She further testified that no one had ever told her not to use this back door, that there were no warning signs, no lights or anything indicating danger; that the ditch was open and uncovered and that before the ditch was dug one went out this door on a cement walk to the sidewalk just a few feet from the main street. That after she had crawled back to her room, Mr. Yockers, the manager, came in and said, "How in the world did you do it?" and "My God, I will have to fasten that door before somebody else gets hurt."

On cross-examination she testified that she had been in and out of the hotel several times on the day in question but had used the lobby door; that her last previous visit to the hotel was a month or six weeks prior to this time; that she had seen various people use this back door on this particular visit and that she had gone out of the door at night on previous visits.

One Deweese, who had been a bellhop at the hotel for about two years, testified concerning the ditch, that he used this door about twice a day; that he could step from the door over to a ledge of cement; that on June 28 he used it once and that at no time did he ever recall the door being wired or nailed shut.

Another witness, a maid on the lower floor, testified that she had occasion to use this door both before and after the ditch was dug and including June 28; that she had never seen the door wired shut and that she had had no difficulty in being able to step across or get around the ditch. That she had seen people other than employees using the door in going to and from the hotel to the street not far from it.

Another witness, a schoolteacher in Norton, testified that she visited the plaintiff the night after the accident and at that time the screen door was hooked and wired shut by use of nails and small wire.

In addition to the foregoing plaintiff also introduced considerable evidence concerning her injuries, and which will be referred to later.

At the conclusion of plaintiff's evidence defendant demurred "for the reason that the plaintiff had not proved facts sufficient to entitle the plaintiff to recover from the defendant; that the plaintiff had failed to prove culpable negligence on the part of the defendant; and that her evidence proved contributory negligence on her part."

The demurrer was overruled.

Yockers, the manager of the hotel during the month of June, 1947, resided in Denver at the time of trial and his testimony was taken by deposition. He testified to the general floor plan of the hotel, that this back door was not usually used by guests in entering and leaving the hotel; that it would have been much simpler and a shorter route to go outside had plaintiff used the lobby entrance, and that during the construction work he had instructed his employees not to use the back door. That a few days before the night in question he had wired the screen door shut by driving a heavy nail into the door sill and one into the screen door and then wrapped wire from one nail to the other in order to hold it shut securely; that it thus could not be opened without unwinding the wire from the nails and that to his knowledge no one other than plaintiff had attempted to use it after he had wired it shut. That he personally checked the wiring on the screen door at six o'clock on the evening in question and that it was wired shut at that time; that after plaintiff sus-

tained her injuries he checked it and found that the wire had been unwound. On cross-examination he testified that he had not put any warning sign on the door; that there was no light outside other than what came in from the street; that after plaintiff was injured he caused her to be taken to the Norton hospital for examination; that the hotel company paid the hospital and a local doctor for their services, and that plaintiff was not charged for her room for the week or ten days she remained in the hotel following her injuries. He denied that he stated to plaintiff after the accident that he guessed he "would have to wire the door shut." He admitted that this door had frequently been used by guests of the hotel prior to the time in question; that he had not instructed any of the guests not to use the door; that right over the door there was a sign marked "exit" and that the ditch into which plaintiff fell was located just outside the door.

Mr. Frame, the contractor in charge of the construction work, testified concerning the ditch and that about noon of the day in question he attempted to use this door but found it was wired shut; that he unwired it at that time and then at five o'clock in the evening when he left work he wired it shut again. He testified in some detail as to the manner in which the door was fastened and wired, but which will not be narrated here.

The manager of the hotel coffee shop testified that after June 24 she and her fellow employees used the lobby entrance of the hotel because of the construction work being done in the rear, and that Mr. Yockers had asked them to do so.

Two other witnesses for defendant, a cook in the coffee shop and a chambermaid, testified in substance that they had been told by Mr. Yockers not to use this door while the construction work was going on and one of them stated that she had noticed the door was wired shut on June 28.

Another witness, a local physician, who examined plaintiff on January 14, 1948, testified as to her injuries, reference to which will be made later.

Special questions were submitted to the jury and they, together with the answers, are as follows:

"1. Q. Did the defendant, on the night of June 28, 1947, maintain a front entrance and exit at its hotel for the use of its guests, which was well-lighted and safe, and opened upon the public sidewalks at Norton, Kansas, at the time the plaintiff received her injury? A. Yes.

"2. Q. Did the plaintiff for her own convenience voluntarily choose to

leave the defendant hotel by the rear door on the night of June 28, 1947? A. Yes.

"3. Q. Was the plaintiff familiar with the conditions which existed at the rear of the defendant hotel from June 24, 1947, to the time of her injury? A. No.

"4. Q. Was it so dark at the rear of the defendant hotel, at the time the plaintiff attempted to leave the hotel by the rear door, that she could not see the excavation and other conditions which existed outside the rear door? A. Yes, it was dark.

"5. Q. If you answer the last question 'Yes' then state what the plaintiff did to find out whether she could safely leave the hotel by the rear door before she went out? A. She had no warning and did nothing.

"6. Q. If you find that, at the time the plaintiff started to go out the rear door of the hotel, there was sufficient light that by the exercise of ordinary care the plaintiff could have seen the excavation and conditions existing outside said door before stepping out, then state what plaintiff did for her own protection prior to stepping out said door? A. She had no chance to do anything.

"7. Q. Was the screen door at the rear of the defendant hotel securely fastened shut with baling wire by Harold Frame at approximately 5 p. m., June 28, 1947? A. No.

"8. Q. Was said screen door found by C. A. Yockers to be securely wired shut at 6 P. M., June 28, 1947? A. No, it wasn't wired.

"9. Q. If you find that said screen door was wired shut at 5 P. M., June 28, 1947, then state:

"(a) Who unfastened said wire on said door? A. ——0——. and

"(b) When was said wire unfastened? A. ——0——.

"10. Q. If you find the defendant guilty of negligence which was the proximate cause of plaintiff's injury, state in detail the facts constituting such negligence? A. Failed to notify her—Failed to fastened door and failed to cover hole—failed to have a warning sign."

Following the return of the general verdict for plaintiff and the answers to special questions, the defendant filed a motion to set aside that portion of the answer to question number 4 following the word "yes" for the reason that such words are surplusage and argumentative; the words "she had no warning and" in the answer to question number 5 on the ground they are surplusage, argumentative and an attempt to evade the question; and to set aside the answers to questions 7, 8 and 10 on the ground they are contrary to and not sustained by the evidence and given under the influence of passion and prejudice of the jury in an effort to make their answers conform to the general verdict.

Defendant also moved for judgment on the answers to special questions notwithstanding the general verdict, and for a new trial.

All of these motions were by the court overruled. Judgment was

entered on the general verdict, following which defendant perfected this appeal.

Defendant's first complaint is that the court erred in overruling its demurrer to plaintiff's evidence, and relies upon *Kurre v. Graham Ship By Truck Co.*, 136 Kan. 356, 15 P. 2d 463, in support thereof. In that case it was held:

"Where a business invitee enters the premises of the inviter and follows a course of his own choosing, with which he is unfamiliar, and which is so dark that he cannot see, resulting in his injury, he is guilty of contributory negligence." (Syl. ¶ 2.)

We have no fault to find with this rule but do not believe that the facts of that case justify its application here. In that case the basis of the decision was that plaintiff was not familiar with the path he was pursuing and that he had some warning of the danger when he came in contact with boxes and other obstructions. In the case now before us plaintiff's evidence showed that on several previous occasions, when staying at the hotel, she had used the back door, had observed other guests doing the same and that she had no warning or knowledge of the hidden danger immediately outside the door. The rule to be followed in testing the sufficiency of evidence as against a demurrer is well stated in *Jones v. McCullough*, 148 Kan. 561, 83 P. 2d 669:

"In testing the sufficiency of evidence as against a demurrer, the court shall consider all of plaintiff's evidence as true, shall consider that favorable to plaintiff, together with all reasonable inferences to be drawn therefrom and disregard that unfavorable to plaintiff, and shall not weigh any part that is contradictory, nor weigh any differences between his direct and cross-examination, and, if so considered, there is any evidence which sustains the plaintiff's case, the demurrer should be overruled." (Syl. ¶ 1.)

"In determining whether a plaintiff is guilty of contributory negligence, when tested by demurrer or on motion for a directed verdict, the question must be submitted to the jury if the facts are such that reasonable minds might reach different conclusions thereon." (Syl. ¶ 2.)

In the case of *Criswell v. Bankers Mortgage Co.*, 128 Kan. 609, 278 Pac. 722, this court said:

"Whatever refinements may be discovered in particular decisions, the rule is general that wherever men engaged in business invite the public to come upon their premises to patronize them, whether the business be that of hotel keeper, or merchant, or railway carrier or what not, there is a duty resting on the proprietor or manager in control of the business to keep in a reasonably safe condition those portions of his premises where guests or customers may be expected to come and go, and where he fails in that duty and a guest or customer is injured thereby a cause of actionable negligence will arise."

and it was held:

"It is the duty of a hotel keeper to keep in a reasonable safe condition those portions of his hotel where his guests may be expected to come and go, and it cannot be said as a matter of law that there was no actionable negligence in his failure to sufficiently light a hallway through which the plaintiff had to go to reach her room and whereby she walked through an open doorway and fell down a stairway and was injured, but the issues of fact concerning the hotel keeper's negligence and of plaintiff's contributory negligence were for the jury." (Syl. ¶ 2.)

See, also, *Bass v. Hunt,* 151 Kan. 740, 100 P. 2d 696.

Appellant's argument that as a matter of law appellee was guilty of contributory negligence is untenable under the evidence introduced in her behalf and under the rule stated. Furthermore, as a matter of law one is not guilty of negligence who does not look for danger where there is no reason to apprehend any. *Buck v. Miller Amusement Co.,* 166 Kan. 205, 200 P. 2d 286. We think the demurrer to plaintiff's evidence was properly overruled.

Appellant's next three assignments of error, namely, that the court erred in not setting aside answers to special questions, in overruling the motion for judgment notwithstanding the general verdict, and in overruling the motion for new trial, may be discussed together. From the journal entry of judgment it appears that the lower court considered the answer to question number 4 to be an affirmative answer; the answer to question number 5 to be a negative answer, and that such explanation in both answers was of some value in showing the theory of the jury when considered in connection with answer to question number 10. To take up and discuss in detail each of the answers returned by the jury and the evidence in support thereof would unduly extend this opinion and we consider it sufficient to say that each of the answers is supported by substantial, competent evidence. Appellant's complaint as to answers 7 and 8 cannot be sustained for the reason that apparently the jury did not believe the testimony concerning the condition of the screen door at five and six o'clock P. M. of the evening in question. Moreover, even if those answers were stricken out plaintiff would still be entitled to recover on the remaining answers. This was primarily a fact case and it was entirely within the province of the jury, under proper instructions, to determine what the facts were. No complaint is made concerning instructions given by the court and so we can assume that the jury was properly instructed concerning the law of negligence, proximate cause, damages and

other material matters. We are unable to find the lower court erred in overruling these three motions.

This brings us to appellant's last complaint, namely, error of the court in rendering an excessive judgment. Plaintiff sued for damages in the amount of $5,000. The jury's verdict was for $3,500, and the lower court rendered judgment thereon in that amount. The elements of damage were not itemized by the jury and from the record it would appear that it was based chiefly on shock, pain and suffering resulting to plaintiff. Error based on an alleged excessive verdict and judgment is seldom an easy question for an appellate court to review and is particularly difficult where the sum allowed is for pain and suffering. Many verdicts have "shocked the conscience of this court" so that a remittitur or reversal has been ordered, but there is no uniform yardstick or hard and fast rule by which the excessiveness of a verdict can be measured in a case such as this. We find nothing in the record to substantiate appellant's argument that the verdict was returned under the influence of passion and prejudice, in which event, under the rule, we would be compelled to order a new trial rather than a remittitur.

Was this verdict excessive? No good purpose would be served in detailing the evidence with reference to plaintiff's being confined to her bed for over a week following her injuries, her pain and suffering, her sprained and swollen ankle, the cut and sprain to her back, the fact that she had to use crutches for over two months, her loss of work, the permanency of the injuries to her back and legs, her inability to sleep and the resulting shock otherwise to her physical and nervous system—the jury heard all of this testimony, had the opportunity to observe the plaintiff and the other witnesses, and found in her favor in the amount stated. As was said in *Rosson v. Wichita Transportation Corp.*, 167 Kan. 24, 204 P. 2d. 591:

"In order to hold this verdict excessive we would have to substitute our judgment for that of the jury and the trial court and under the facts and circumstances of this case we do not feel compelled to do so."

We find no error in the record before us and the judgment of the lower court is therefore affirmed.