No. 40,365

Mrs. Frank Kurdziel and Frank Kurdziel, *Appellees*, v. Peter A. Van Es, d/b/a Van Es Electrical Construction Company, and Joe Gildersleeve, *Appellants*.

(306 P. 2d 159)

Opinion filed January 12, 1957.

*Tinkham Veale*, of Topeka, argued the cause, and *John E. DuMars*, of Topeka, was with him on the briefs for the appellants.

*Harold E. Doherty*, of Topeka, argued the cause, and *George A. Scott*, and *James E. Benfer, Jr.*, both of Topeka, were with him on the birefs for the appellees.

The opinion of the court was delivered by

Wertz, J.: This was an action for damages for wrongful death (G. S. 1949, 60-3203), brought by plaintiffs (appellees) Mr. and Mrs. Frank Kurdziel, parents and next of kin of their deceased minor son Frank B. Kurdziel, Jr., aged three years, against defendants (appellants) Peter A. Van Es, d/b/a Van Es Electrical Construction Company, and Joe Gildersleeve. From a judgment in plaintiff's favor defendants appeal.

The petition, so far as material herein, alleged that defendant Van Es was doing business as an electrical construction company, and Gildersleeve was his agent and employee; that defendants installed in the premises, later occupied by plaintiffs, a switch box and connection and outlet for a clothes dryer; that they negligently performed the work in a manner as to permit the outer metal shell and metal trimmed table top which was in the kitchen to become charged with electricity to the extent of 115 volts. Plaintiffs alleged defendants were guilty of the following specific acts of negligence: (1) By installing four No. 10 insulated wires in a ½ inch Romex connector in direct violation of the National Electrical Code and

the Electrical Code of the City of Topeka; (2) by installing four No. 10 insulated wires within a cable connector which was too small to hold the wires when they knew damage would be done to the insulation upon the wire, thereby charging the surrounding metal objects with electricity and making the electrical installation unsafe; (3) by the failure to properly provide and install a grounding system to the dryer outlet installation, and particularly the two pole 30 amp disconnector switch when they knew that the electrical system which was improperly grounded was a dangerous instrumentality, and (4) in failing to warn or notify the occupants of the premises of the negligent manner in which the installation was made. It was further alleged that on July 14, 1954, plaintiffs' infant son, aged three, came in contact with a flat-topped object which had been charged with electricity as a result of the negligence of defendants, resulting in their son's death; that plaintiffs expended $600 for funeral expenses, and that they suffered mental anguish, bereavement, loss of society and companionship of their son, severe and excruciating pain, and asked to recover $15,000.

Defendant Van Es filed his answer containing a general denial and further stated that Gildersleeve was his employee acting in the furtherance of his business, and that on February 11, 1953, Gildersleeve went to the premises and installed a switch box to be used in connection with a clothes dryer, and that the box was installed in a good workmanlike manner and in full compliance with the National and City Electrical Codes, and if the switch box became defective it was through no fault of the defendant or his employee, but the negligence of some other person unknown to defendant. The answer further alleged that plaintiffs knew or could have known of the defective condition of the premises prior to the time of the death of their son, and that they made no effort to report or correct the same, or to guard their son or other persons coming in contact with the defective condition, and that they were guilty of contributory negligence in permitting the defective condition of the premises to remain, and in permitting their child to climb on the cabinet in the kitchen where he was injured. Gildersleeve's answer was to the same effect.

Plaintiffs filed a general denial to the mentioned answer, and their evidence in support of allegations contained in their petition may be briefly summarized as follows: On February 11, 1953, defendants went to the premises then occupied by Major Howard and

his family, later occupied by plaintiffs, and installed an electric switch box in the kitchen on the west wall about ten inches over the bread board, or serving surface which was on either side of the sink, and an outlet for a clothes dryer. About July 1, 1953, Plaintiffs and their infant son moved into the premises and occupied them continuously until the death of their son, July 14, 1954. At 10 a. m. on that date, the mother and son were playing together in the living room. She left the child for approximately three minutes while attending to another child. She returned and went into the kitchen and found the deceased child sitting on his knees on the work bench of the cabinet with his right shoulder against the switch box that defendants had installed, and his feet and legs rested on the metal strip which went around the outside edge of the work bench. The child had been electrocuted. The city electrical inspector was called to the premises, having examined the installations made by defendants, and found they had been negligently installed in violation of the electrical code and were defective in three particulars as follows: (1) Four No. 10 wires had been installed into a ½ inch instead of a ¾ inch Romex cable connector, in violation of the national and city codes; (2) Four No. 10 installation wires had been installed into a hole which was too small to hold the wires, and (3) a metal box had been installed upside down on the wall and had not been grounded. The electrical inspector further testified that the records of his office failed to disclose a request for inspection and a permit for the installation. Tests showed that if a person touched the box on which the child's right shoulder was leaning when found, and the metal strip on which his feet and legs were touching, it would complete a circuit by grounding the box which was termed "hot", and 113 to 115 volts of electricity would pass through the body. The city electrical inspector testified that a voltage beyond 25 would be considered deadly under the circumstances. Medical testimony disclosed that 115 volts of electricity would cause the death of a baby two and a half years of age.

Two doctors testified that in their opinion the child had been electrocuted. Plaintiff testified that the switch box was about ten inches from the table top which was on either side of the kitchen sink, and there was a chrome strip around it, and that her child's legs were resting on the chrome strip with his right shoulder against the box. When she saw the child she grabbed him, and he was dead. She testified that she had never received a shock of any

kind from the box, and that she knew nothing of any shorts in the year and a half she had lived in the house, and that she had never touched the switch box and the metal strip at the same time.

The city electrical inspector testified that he found four violations of the electrical code. He observed that the insulation on one of the wires had been damaged and that the damage was at the point of contact with a half-inch Romex connector; that he found four No. 10 conductors which came through the connector, and the connector was clamped. The white conductor was pinched by the clamp so that the insulation had become impaired and an electrical contact was made by that conductor to this box so that the box itself was "hot".

Mr. Egland testified he owned an electrical company and was the present employer of Mr. Gildersleeve; that he went to the premises in question after the child was killed and put his hand on the electric box and the rim around the cupboard and received a shock. He opened the lid of the electric box and observed on its cover that it was a Van Es box. He called Mr. Van Es and told him one of his boxes was "just hotter than the dickens to a ground and that a baby had been killed, . . . and invited Mr. Van Es to come out;" The witness and the electrical inspector tested the box with a voltmeter, making contact with the box to the rim of the sink, and it showed 114-117 volts. He further testified to the faulty installation. Other detailed evidence of the electrical installation, and wherein it was in violation of the electrical codes, and the terms of the ordinance, needs no further narration. At the close of plaintiffs' evidence, defendants interposed a demurrer thereto on the ground that plaintiffs failed to prove a cause of action against them and that plaintiff, Mrs. Kurdziel, was guilty of contributory negligence as a matter of law. This demurrer was overruled and was assigned by defendants as error.

Defendants' evidence disclosed that on February 11, 1953, Van Es sent Gildersleeve to the premises in question to wire for an electric clothes dryer. Gildersleeve testified that after he learned of the death of the child in July, 1954, he got in touch with the city inspector, at which time he saw the switch box and other parts of the installation, which was not his installation. It was bungled or bobbled up. There were too many violations. It was not grounded. There were four No. 10 wires through a half-inch Romex connector which was a violation, and there were no connectors

used in the range combination or the main service panel. He would say there were at least four violations, but he did not make the installation.

The case was submitted to the jury which, after deliberating, returned its general verdict in favor of plaintiffs and against defendants in the sum of $12,000. At the same time the jury returned its answers to special questions submitted by the court as follows:

"1. Do you find the defendants guilty of any act of negligence as alleged by the plaintiffs in their petition? Answer: Yes.

"2. If you answer No. 1 in the affirmative, state of what such negligence consisted. Answer: ¾" Romax connector should have been installed in place of the ½" Romax connector. No ground installed. Peter A. Van Es committed negligence by not making certain that an electrical inspection was made upon switch box and connection and outlet for a clothes dryer upon completion of electrical work.

"3. Do you find the plaintiffs guilty of contributory negligence upon any of the grounds alleged by the defendants in their answers: Answer: No.

"4. If you answer No. 3 in the affirmative state of what such negligence consisted. Answer: None.

"5. Did the plaintiffs or either of them have knowledge of the defective condition of the wiring prior to the death of their son? Answer: No.

"6. What do you find to be the cause of death of Frank B. Kurdziel, Jr.? Answer: Electrocution."

From an order overruling defendants' post trial motions, they appeal.

Defendants first contend that plaintiff, Mrs. Kurdziel, was guilty of contributory negligence as a matter of law, and that the trial court erred in overruling their demurrer to the evidence. Their contention is predicated on the theory that Mrs. Kurdziel knew of the switch box over the kitchen sink; that she had previously received a shock from it, and that the child had previously climbed on the table top around the sink, and nevertheless she left the child on the living room floor from three to five minutes while she attended to her small baby in another room. Plaintiff testified she had never received a shock from the switch box or the chrome strip around the table top, and had no knowledge of the defective condition of the wiring in the kitchen. Defendants' contention is untenable in view of plaintiff's evidence. The plaintiff was in her home, and had every reason to believe that it was safe for her and her children. It cannot be said that a mother must be in constant sight of her child every minute of the day. She had been playing with the child in the next room. While she was gone, the little boy went to the kitchen and climbed on the table top, coming in contact with the switch box and was electrocuted. It is an established rule

of law that one is not guilty of negligence who does not look for danger where there is no reason to apprehend any. ( *Buck v. Miller Amusement Co.*, 166 Kan. 205, 200 P. 2d 286; *Harral v. Kent Corporation*, 168 Kan. 322, 329, 212 P. 2d 356.)

It is contended that plaintiffs failed to prove damages in excess of the $600 funeral expense, and that the verdict of the jury was excessive. The established rule of this jurisdiction is that in order for a verdict, in an action of the character here involved, to be set aside or reduced as excessive, it must appear from all the facts and circumstances disclosed by the record that it is so large as to shock the conscience of the court.

G. S. 1949, 60-3203, which permits actions for wrongful death, in effect at the time of the child's death, limits recovery to $15,000 and provides, among other things:

"Damages may be recovered hereunder for, but not limited to: ( *a* ) Mental anguish, suffering or bereavement; ( *b* ) loss of society, companionship, comfort or protection; ( *c* ) loss of marital care, attention, advice, or counsel; ( *d* ) loss of filial care or attention; and ( *e* ) loss of parental care, training, guidance or education."

The above provision was added to the statute by the legislative session of 1947. (Laws 1947, ch. 319.) Prior to that enactment, the measure of damages in such an action was the pecuniary loss sustained by plaintiffs. By the mentioned act, the legislature provided that other considerations than pecuniary loss should be considered. ( *Hadley v. Security Elevator Co.*, 175 Kan. 395, 398, 264 P. 2d 1076; *Soden v. Bennett*, 173 Kan. 142, 152, 244 P. 2d 1204; *Duran v. Mission Mortuary*, 174 Kan. 565, 580, 258 P. 2d 241.) It is a difficult task to measure the damages sustained by the parents' loss of society, companionship, comfort or protection of a child. The jury is the judge of this. There is nothing in the record to indicate bias or prejudice on the part of the jury, and certainly the amount of the verdict under the circumstances does not shock the conscience of the court.

At the close of the trial, defendants requested the court to submit eight special questions prepared by them to the jury. This request was denied, and in lieu thereof the court submitted six of its own as heretofore set out. Defendants contended that under G. S. 1949, 60-2918, they had the right to request and have submitted at least ten special questions, and that it was error for the court to refuse their request. We recognize the force of the mentioned statute. However, it is only applicable where the requested questions are

based on material, controverted facts, and if they are of the type that there is evidence from which the jury can answer them. It is a well recognized rule in this state that the trial court has wide discretion respecting special questions to be submitted to the jury, and when it appears the questions are not pertinent to the issues, nor supported by the evidence, nor intended to bring out some ultimate fact in the case, it is proper to refuse to submit them. It is the duty of the trial court to supervise and shape special interrogatories that are submitted to the jury, and it may reject questions that are improper or immaterial and limit the questions to ultimate facts on controverted issues. (*Finke v. Lemle,* 173 Kan. 792, 252 P. 2d 869; *Snyder v. Eriksen,* 109 Kan. 314, 198 Pac. 1080.)

We have carefully considered defendants' requested questions and those submitted by the court and are of the opinion that the questions submitted sufficiently covered all of defendants' requests which were material to the controverted issues involved.

Defendants contend the trial court erred in refusing to give four instructions to the jury as requested in writing by them. No useful purpose would be served by detailing the instructions requested, nor the instructions which the trial court gave. We have carefully considered all of them and it is revealed, although differently phrased, the substance of the requested instructions was contained in those given the jury, and it was properly advised as to the law applicable to the case.

Other contentions asserted by defendants have been examined and found to be without sufficient merit to require reversal of the judgment. In view of what has been said, the judgment of the trial court is affirmed.

HALL, J., not participating.