**In the Matter of the Complaint of SIN-CERE NAVIGATION CORPORATION, as owner of the S/S HELENA, for exoneration from or limitation of liability and Consolidated Cases.**

Civ. A. Nos. 68-2254, 68-2243, 68-2250, 69-2340, 69-2341, 69-2535, 69-2613, 69-2628, 69-2742, 69-2743, 69-2854, 69-2855, 69-2889, 69-2899, 69-2903, 69-2923, 69-2924 and 70-40.

United States District Court,
E. D. Louisiana,
New Orleans Division.
June 23, 1971.

See also D. C., 327 F.Supp. 1024.

Gerald J. Gallinghouse, U. S. Atty., Allen van Emerik, for the United States.

George Frilot, A. J. McNamara, Joseph Horne, Charles M. Steen, New Orleans, La., Jerry G. Jones, Louis B. Merhige, Raymond A. McGuire, New Orleans, La., David H. Burrow, for individual claimants.

Patrick L. Burke, Joy S. Miller, New Orleans, La., Joseph M. Brush, for Sincere Navigation and its insurers.

RUBIN, District Judge:

Following this court's determination that the collision of the S/S HELENA and the Coast Guard buoy tender WHITE ALDER on December 7, 1969, resulted from the mutual fault of both vessels and that, as to the personal injury and death claimants, neither vessel was entitled to limit liability, a hearing was held to elicit evidence concerning the amount of damages suffered by those claimants who have not entered into a settlement with the HELENA. Two of them are the survivors of the casualty; the others are the beneficiaries of decedents.

Prior to the decision in Moragne v. States Marine Lines, Inc., 1970, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339, the assessment of damages would have been determined by Louisiana law since the collision occurred on the Mississippi River, in Louisiana's territorial waters. The Tungus v. Skovgaard, 1959, 358 U. S. 588, 79 S.Ct. 503, 3 L.Ed.2d 524. But when the Supreme Court concluded in *Moragne* that an action lies under general maritime law for death caused by violation of maritime duties, it in effect overruled *The Tungus*. See Dennis v. Central Gulf Steamship Corp., E.D. La.1971, 323 F.Supp. 943.

Our first guide to the rules now applicable is the observation in *Moragne*, "If still other subsidiary issues should require resolution, such as particular questions of the measure of damages, the courts will not be without persuasive analogy for guidance. Both the Death on the High Seas Act and the numerous state wrongful-death acts have been implemented with success for decades. The experience thus built up counsels that a suit for wrongful death raises no problems unlike those that have long been grist for the judicial mill." 90 S. Ct. at 1792.

Considering this problem a few months ago in *Dennis*, I concluded that many items of damage were properly allowable both under the Death on the High Seas Act and under the rule applied by a majority of state wrongful-death acts. Therefore the following items of damage, usually awarded in both groups of cases, were there allowed:

1. Loss of support
2. The decedent's conscious pain and suffering
3. The decedent's lost wages
4. Funeral expenses
5. Loss of services

## I. SURVIVORS' EMOTIONAL DISTRESS

However, the facts in *Dennis* did not require determination of one of the issues here presented: in a death action, may there be recovery for the emotional distress suffered by the surviving spouse or, in the case of those who died unmarried, the parents of the decedent?

The channel here is as hard to find as the course of the Mississippi River and there is neither custom to follow nor pilot to guide. But is clear that there is no bar in the maritime law to the recovery of damages for emotional injury as such. Personal injury claimants have repeatedly, and as a matter of course, been allowed damages for mental suffering in suits brought under general mari-

time law [1] and under the Jones Act.[2] And even in a death action, there can be recovery for the decedent's pain and suffering before death. St. Louis I. M. & S. Ry. v. Craft, 1915, 237 U.S. 648, 35 S.Ct. 704, 59 L.Ed. 1160; U. S. Steel v. Lamp, 6 Cir. 1970, 436 F.2d 1256.

Since Michigan Central R. R. Co. v. Vreeland, 1913, 227 U.S. 59, 33 S.Ct. 192, 57 L.Ed. 417, a case involving the Federal Employers' Liability Act, no recovery has been allowed for the emotional distress suffered as a result of the death of another under the FELA, the Jones Act or the Death on the High Seas Act. Relying on the interpretation that British courts had given Lord Campbell's Act, the Supreme Court held in *Vreeland* that the purpose of the FELA wrongful death action was "compensating certain dependent members of the family for the deprivation, pecuniarily, resulting to them from his wrongful death. * * *" Id. at 195. The same rule was necessarily applied in Jones Act Cases,[3] and it is a part of the statutory language of D.O.H.S.A.[4] See First National Bank in Greenwich v. National Airlines, Inc., 2d Cir. 1961, 288 F.2d 621, 624.

This limitation was early applied in state wrongful death statutes.[5] However, in Louisiana, perhaps as a result of the civilian influence on its law, the damages allowed for wrongful death have included compensation for survivor's grief at least since the beginning of this century.[6] That also has been the rule in France.[7]

In recent years there has been a marked tendency in the common law states to expand the concept of damages recoverable for wrongful death to embrace some measure of compensation for the emotional suffering of survivors. To some extent, this tendency may be inferred from the large damage verdicts awarded to the parents of deceased children by juries in states that permit pecuniary losses alone. Since the expenses of raising a child are to be deducted from any monetary benefits he might provide the family, one would expect to find only nominal damages awarded for the death of minor children in such states.[8] Professor Prosser has commented that juries that make these large awards "have taken the bull by the horns, and in reality have compensated for the prohibited sentimental aspects of the family relation, with the court benevolently winking at a flagrant violation of the rule it has laid down."[9] In at least one state that awards damages

1. Cleary v. U. S. Lines Co., 2 Cir. 1969, 411 F.2d 1009; Gloria Steamship Co., Inc. v. Smith, 5 Cir. 1967, 376 F.2d 46; Norris, Maritime Personal Injuries, § 53.

2. Imperial Oil Ltd. v. Drlik, 6 Cir. 1956, 234 F.2d 4, cert. den. 352 U.S. 941, 77 S.Ct. 261, 1 L.Ed.2d 236; Norris, The Law of Seamen, § 697 (3rd ed.).

3. The Federal Employers' Liability Act governs seamen's suits under the Jones Act. See 46 U.S.C. § 688 and historical note.

4. 46 U.S.C. § 762. "The recovery in [a suit under the DOHSA] * * * shall be a fair and just compensation for the pecuniary loss sustained by the persons for whose benefit the suit is brought * * *." Neither the DOHSA nor the Jones Act reimburse all who suffer a pecuniary loss as a result of death. They permit recovery only by a designated class of beneficiaries. Others may lose monetary benefits; they cannot recover.

5. See Comment, A Modern View of Wrongful Death Recoveries: Herein of the Infant and the Aged, 54 NW.L.Rev. 254 (1959) (hereafter cited A Modern View); Comment, Damages for the Wrongful death of Children, 22 U.Chi.L.Rev. 538 (1955).

6. See Parker v. Crowell & Spencer Lumber Co., 1905, 115 La. 463, 39 So. 445; LSA–C.C. Art. 2315.

7. 2 Planiol, Traité Élémentaire DeDroit Civil, § 868A. The civilian jurisdictions are not uniform in this view. Thus, German Law apparently does not provide recovery for emotional harm. See, Comment, Damages for the Wrongful Death of Children, n. 5 supra at 548.

8. See, A Modern View, n. 5 supra at 260–1; Comment, Damages for the Wrongful Death of Children, n. 5 at 541–5.

9. Prosser, The Law of Torts, § 121, p. 931 and cases cited therein.

solely for pecuniary losses, the courts rely on a presumption that the death of a child causes the parents a substantial, recoverable injury.[10] The presumption would seem to serve as a mask for awards for emotional deprivation.[11]

In many states, non-pecuniary damages are explicitly permitted.[12] All but eight states supplement the damages awarded for the loss of monetary contributions with allowances for the loss of intangibles such as the loss of parental services of care, guidance and control.[13] The three federal statutes also permit this.[14] While a monetary equivalent for such services is more easily determinable than for sentimental losses, the deprivation of these services is not dissimilar from the other psychic injuries caused by the death of a loved one. In addition, twenty-four states presently permit recovery for sentimental loss: the love and affection of the deceased or the mental anguish of the beneficiaries.[15]

Human experience, as well as the literature of psychiatry[16] and psychology[17] bear abundant evidence of the debilitating effect of grief and the resultant depression. It is certainly no less real, and no more difficult to appraise, than the "mental and physical pain and suffering" attendant upon personal injury that is awarded those who survive, or the pain and suffering prior to death that is recoverable as part of the death action here. Dennis v. Central

10. The state is Maine. See Carrier v. Bornstein, 136 Me. 1, 1 A.2d 219 (1938).

11. Comment, Damages for the Wrongful Death of Children, n. 5 supra at 545.

12. The discussion of the different state laws is based on annotations in Comment, Wrongful Death Damages in North Carolina, 44 U.N.C.L.Rev. 402 (1966) ; Anno., Measure and elements of damages for personal injury resulting in death of infant, 14 A.L.R.2d 485 (1949) ; Note, Damages for Wrongful Death Under the FELA, 30 NACCA L.J. 271 (1964). No information on the scope of recovery permitted in Rhode Island or New Mexico was found.

13. The states are Colorado, Connecticut, Delaware, Kentucky, Maine, Maryland, New Jersey and North Carolina.

14. See Michigan Central R. Co. v. Vreeland, 227 U.S. 59, 33 S.Ct. 192, 196, 57 L.Ed. 419 (1913).

15. States that permit recovery for sentimental loss: Alabama, Sloss-Sheffield Steel & Iron Co. v. Drane, 5 Cir. 1908, 160 F. 780 (The theory of Alabama damages is to penalize the defendant not compensate the plaintiff. See, Comment, Wrongful Death Damages in North Carlina, n. 12 supra at 406) ; Alaska, Alaska Stat. § 13.20.340 (1962) ; Arizona, Merritt-Chapman & Scott Corp. v. Frazier, 9 Cir. 1961, 289 F.2d 849 ; Arkansas, Tiner v. Tiner, 379 S.W.2d 425 (1964) ; Florida, Klepper v. Breslin, 83 So.2d 587 (1955) ; Georgia, Western & Atlantic R. Co. v. Michael, 178 Ga. 1, 172 S.E. 66 (1933) app. dism. 291 U.S. 649, 54 S.Ct. 530, 78 L.Ed. 1044, reh. den. 291 U.S. 654, 54 S.Ct. 560, 78 L.Ed. 1044 ; Hawaii, Gabriel v. Margah, 37 Haw. 571 (1947) ; Idaho, Gardner v. Hobbs, 69 Idaho 288, 206 P.2d 539 (1949) ; Illinois, Compare Hall v. Gillins, 13 Ill.2d 26, 147 N.E.2d 352 (1958) with Webb v. Henke, 10 Ill.App.2d 152, 134 N.E.2d 540 (1956) ; Iowa, Leahy v. Morgan, D.Ia.1967, 275 F.Supp. 424 ; Kansas, Kurdziel v. Van Es, 180 Kan. 627, 306 P.2d 159 (1957) ; Louisiana, Lewis v. State, App.1965, 176 So.2d 718, writ refused 248 La. 364, 178 So.2d 655 ; Mississippi, Louisville & Nashville R. Co. v. Whisenant, 214 Miss. 421, 58 So. 2d 908 (1952) ; Montana, Mize v. Rocky Mtn. Bell Tel. Co., 38 Mont. 521, 100 P. 971 (1909) ; Nevada, Porter v. Funkhouser, 79 Nev. 273, 382 P.2d 216 (1963) ; Oregon, Rev.Stat. 30.010 (1953) ; Pennsylvania, Spangler v. Helm's Motor Express, 396 Pa. 482, 153 A.2d 490 (1959) ; South Carolina, Gregg v. Coleman, D.S.C.1964, 235 F.Supp. 237 ; South Dakota, Simons v. Kidd, 73 S.D. 306, 42 N.W.2d 307 (1950) ; Tennessee, Tenn.Code Ann. § 20-614 (1956) ; Virginia, Baltimore & O. R. Co. v. Noell, 32 Gratt. 394 (1879) ; West Virginia, Lester v. Rose, 130 S.E.2d 80 (1963) (jury can award up to $10,000 for non-pecuniary losses) ; Wisconsin, Wis.Stat.Ann. § 331.-03-.04 (1958, Cum.Supp.1963) (recovery for loss of society and companionship limited to $3,000) ; Wyoming, Muir v. Haggerty, 77 Wyo. 280, 314 P.2d 948 (1957).

16. See Ewalt and Farnsworth, Textbook of Psychiatry 193-4 (1963).

17. Jastrow, Character and Temperament, 136-143 (1915).

Gulf Steamship Corp., E.D.La.1971, 323 F.Supp. 943, 949.[18]

In establishing a general maritime right of recovery, *Moragne* did not so much reject the rationale of *The Harrisburg* as rely on significant developments in the one hundred fifty years since.[19] With respect to psychic trauma, the original decisions by the English and American Courts seemed rooted in a no longer tenable concept of injury to the person.[20] Again the changes in the personal injury laws of the states provide the most persuasive guides to decision. Thus I conclude that recovery will be permitted for the grief of the four survivors. This conclusion may conflict with *Moragne's* goal of uniformity of recovery for all who perish on navigable waters. Beneficiaries who recover under the Jones Act for the death of seamen may be unable to recover for their grief.[21] It is enough here to recognize this consideration; whether or not it is to be resolved must be determined when a Jones Act death claim is presented. For today, as in the past, it suffices that, "The admiralty has led, not followed." Judge Brown, concurring in part and dissenting in part, China Union Lines v. A. O. Anderson and Co., 5 Cir. 1966, 364 F.2d 769, 798.

## II. DAMAGES TO SURVIVORS

### A. RICHARD KRAUS

■ Mr. Kraus was a Boatswain's Mate, Second Class, midway through his first Coast Guard enlistment, but still undecided about a service career. He is 25 years of age. He was on the WHITE ALDER to get the sea duty he needed for advancement to First Class Boat-swain. When the WHITE ALDER sank, his sea duty ended, for he asked for and was given shore assignment.

At the time of the wreck he was lying in his bunk in the berthing compartment. He isn't certain whether he got out of his berth or was thrown out. The ship began to flood within five seconds. As he swam up through the flooded ship, he thought he was going to die. He hit his head as he ascended. Feeling a bulkhead with his right hand, he pushed along. He broke surface about 45 seconds after the impact, facing downstream and saw a buoy. He swam to it and climbed aboard. In about a minute he was joined by Mr. Kapowski, and later by Mr. Miller. They were rescued about 45 minutes later.

Mr. Kraus was hospitalized 4 or 5 days. His eyes were bloodshot for some time. He still is uneasy on the water and thoughts of the disaster recur whenever he sees ships. A retired Warrant Officer who had known Mr. Kraus before the wreck, and saw him afterward, said that he hardly recognized Mr. Kraus; Richard had "aged beyond recognition." However, at the time of trial he appeared to be vigorous and self-possessed. Mr. Kraus claims no special damages. He suffered relatively little physical injury, and his primary suffering was emotional. For his physical and mental pain and suffering, he is awarded the sum of $10,000.

### B. BRUCE KAPOWSKI

Mr. Kapowski was assigned to the Engineering Department. At the moment of the collision he was playing cards in

---

18. On the proof problem, See Note, Damages for Wrongful Death under FELA, n. 11 supra at 275.

19. Moragne, 90 S.Ct. at 1778.

20. In Nineteenth Century England, the legal system "had a strong, though inconsistent, bias in favor of property and a corresponding unconcern for personal violence (short of murder) where property rights were not involved. * * * Assaults involving concussion and broken bones were commonly met with a fine or a week or two's jail, less severe treatment than might be meted out for accidentally breaking a window. * * *" Chesney, The Anti-Society, An Account of The Victorian Undeground, 92.

21. But if their claim is founded on unseaworthiness, not merely on negligence, their recovery would be measured by *Moragne* standards rather than by the Jones Act.

the mess room. When the vessels crashed, the compartment filled in seconds. He thought for a moment, "This is it." Then he thought of his wife, who was pregnant, and determined that he had to get out. He swam out of the flooded ship, just how he doesn't know. When he surfaced in the river, he saw a buoy, swam to it, and climbed aboard, joining Mr. Kraus, who was already on the buoy.

In escaping from the vessel, Mr. Kapowski's left shoulder was injured, and he suffered minor cuts over his right eye, and on his right leg. He was hospitalized for 1½ days. These have healed, but he still has some minor scars on his shoulder and ankle. He had been in the Coast Guard for almost 4 years and was considering re-enlisting and making it a career. However, after the collision, his wife didn't want him to go to sea and he found it distressing to go aboard a vessel. Therefore he accepted a discharge when his enlistment ended.

There is no evidence that Mr. Kapowski's earnings were adversely affected by his injuries, or that he has any permanent disability other than an aversion to the sea. His physical injuries were minor. His emotional trauma, his physical pain, his exposure to the cold river, and his lasting emotional impact are of far greater consequence. For these items of mental and physical pain and suffering, and emotional injury, he is awarded the sum of $10,000.

### III. COMPUTATION OF DAMAGES WITH RESPECT TO DECEDENTS

#### A. GENERAL CONSIDERATIONS

■ With respect to those decedents who were survived by dependents, the only expert evidence presented with respect to the loss of future support, future economic conditions, and the amount each of the decedents would have required to support himself was Dr. Bernard Sliger's. Dr. Sliger's qualifications as an economist are impressive. His testimony was sensible. He relied on Technical Paper 16, an actuarial study made by the U. S. Department of Labor, in making his computations.

The defendant offered only brief testimony by another expert that the paper was conjectural. No alternative or better basis was suggested.

In my opinion Dr. Sliger's use of Technical Paper 16 was proper. The use of Technical Paper 16 was rejected by the trial court whose decision was affirmed in Barnes v. Smith, 10 Cir. 1962, 305 F.2d 226. But I consider it sufficiently reliable, when presented as evidence, to justify its consideration. Of course the computations made in it are not as precise as chronometers set by Greenwich Mean Time. But all of the factors that enter into the measure of damages are to some degree imprecise. The tool Dr. Sliger used is a reasonably good one.

Dr. Sliger testified to the present value he would place on the loss of support by each dependent. While I consider his method reliable, his estimate of future earnings appeared to be too generous, and his estimate of the amount each decedent would have spent for his own support too conservative.

■ In computing lost earning capacity, the testimony of the survivors regarding the decedent's future plans, together with the decedent's own aptitudes and abilities, and Dr. Sliger's testimony concerning his likely future earnings must all be taken into account. I specifically reject the criterion established in U. S. Steel v. Lamp, supra, which relied on average earnings for the 4-year period prior to death, because in this case, and for these decedents it appears to me to be inaccurate.

#### B. PAIN PRIOR TO DEATH BY DROWNING

■ Each of these death actions all assert survivorship claims for the pain of the deceased prior to his death. Where death was a consequence of drowning and the decedent's suffering was found to be substantially contemporaneous with his death, recovery was denied in The Corsair, 145 U.S. 335, 12 S. Ct. 949, 36 L.Ed. 727 (1892). In Gillespie v. U. S. Steel Corp., 379 U.S. 148, 85 S.Ct. 308, 13 L.Ed.2d 199 (1964), the

court held that *The Corsair* did not preclude all damages for mental suffering prior to death by drowning. Where the pain and anguish was not "contemporaneous with . * * * death and inseparable, as matter of law from it," recovery would be permitted. Id. at 158, 85 S.Ct. at 314.

Evidence was presented that, in the usual case of death by drowning, the decedent is conscious of impending death and likely experiences some suffering for a period perhaps as long as two minutes prior to his loss of consciousness. This conclusion was drawn by a medical expert largely from the early onset of rigor mortis after death by drowning and the likelihood that this indicates strenuous muscular activity immediately prior to death.

Doubtless influenced by their inability to award damages for the emotional distress of survivors, courts have awarded damages in increasingly substantial amounts for the decedent's distress in circumstances where its existence and intensity can only be conjectured. No one can know that any man who perished aboard the WHITE ALDER suffered a moment. Some were likely asleep at the moment of the collision. Others, awake, may have lost consciousness in a minute or less. No bodies were recovered from which any signs could be sought. The court is urged to conclude that all those whose bodies were not recovered died by drowning, that all were conscious for a period of time after the instant of impact, and that all suffered severe pain. The theory is plausible but it can hardly be said to be supported by a preponderance of the evidence. Under the circumstances of this case, the claim for damages for pain and suffering prior to death must be considered conjectural as to any particular decedent. See Petition of Oskar Tiedemann and Co., D.C.Del.1964, 236 F.Supp. 895; Gardner v. National Bulk Carriers, Inc., E.D.Va.1963, 221 F.Supp. 243.

### C. PECUNIARY LOSS

In addition to the possible recovery for survivor's grief, and the action for those damages, if any, that the decedent could himself have recovered had he lived, those claimants whose action arises from death of one of the seamen aboard the WHITE ALDER are entitled to recover the pecuniary loss suffered as a result of the death. This damage item "can not be computed by mathematical formulae nor derived from fixed principles susceptible of being programmed into a computer." Neal v. Saga Shipping Co., S.A., 5 Cir. 1969, 407 F.2d 481, 489.

But a guide is set by determining first how much money the decedent would have had available, and how much of that sum he would have contributed to his beneficiaries. In determining the sum available, we may consider the decedent's work life expectancy, his annual earnings before death, his health, diligence and work habits in general; and his prospects for advancement. Petition of Risdal and Anderson, Inc., D.Mass. 1968, 291 F.Supp. 353, 357.

From the decedent's expected earnings, we must deduct his estimated personal expenses. Since only his net earnings after taxes would be available for support of his beneficiaries, some courts would make a deduction for income taxes. The courts that would not make such a deduction reason that the amount of future taxes is conjectural. But since taxes are no less certain than death itself, I cannot justify excluding them completely from consideration. In determining how much of his net earnings the decedent would have used for his beneficiaries, we must take into account the number of his dependents, the history of his contributions in the past, and the likely changes in the pattern of his contributions as his circumstances change.

Widows may suffer a loss of services having monetary value. If the evidence supports such an allowance, they may be compensated for the reasonable cost of having someone else perform the household tasks that the husband did and would have continued to perform had he lived.

"Children suffer a pecuniary loss from the death of their father in addition to the loss of his support, gifts and similar financial contributions. That loss is commonly identified as the loss of nurture and guidance. A child is not fairly compensated for the loss of a parent whose fitness has been shown, Michigan C. R. Co. v. Vreeland, 1913, 227 U.S. 59, 73, 33 S. Ct. 192, 57 L.Ed. 417, unless he is compensated for loss of nurture because the 'guidance of a parent in matters material, moral and spiritual is of a definite practical and financial value and is subject to pecuniary estimate.' Moore-McCormack Lines, Inc. v. Richardson, 2 Cir., 1961, 295 F.2d 583, 593 n. 9a, 96 A.L.R.2d 1085. In determining the pecuniary value of the loss of a decedent's nurture, consideration should be given to such factors as the education and character of the decedent and the time and attention he devoted to his children when he was alive. Rogow v. United States, S.D.N.Y., 1959, 173 F.Supp. 547, 561–562; Thomas v. Conemaugh Black Lick Railroad, W.D.Pa., 1955, 133 F. Supp. 533, 543. The prospects and character of the child should also be considered. If, for example, it is likely that a child will go away to college, as in Meehan v. Central Railroad Company of New Jersey, supra, 181 F.Supp. [594], n. 4, at 622, loss of nurture may extend only until college age." Petition of Risdal & Anderson, Inc., supra, 291 F.Supp. at 358.

The trier of fact may take into account the possible erosion of any sum paid as a result of inflation, and the effect had he lived on the decedent's capacity to earn, of his probable health (without the injury), the development of his skills, and the condition of the labor markets. See Harper & James, The Law of Torts, §§ 25.8 and 25.11. The sums due must of course be discounted to present value. Chesapeake & Ohio R. Co. v. Kelly, 241 U.S. 485, 36 S.Ct. 630, 633, 60 L.Ed. 1117 (1916).

■ In this Circuit the awarding of pre-judgment interest in personal injury suits tried under the general maritime law rests within the "sound discretion of the trial judge." See Canova v. Travelers Ins. Co., 5 Cir. 1969, 406 F.2d 410; Chouest v. A. & P. Boat Rentals, E.D.La.1971, 321 F.Supp. 1290. If the discount to present value is computed as of the date of death, then this interest is manifestly due for the delay in paying the discounted sum.

In making the allowances set forth below, I have to some degree offset discount to present value by the effects of inflation and a likely rise in the decedent's earnings resulting from increases in the general wage level. I have assumed a discount rate of 5%, and a three per cent inflationary level thus making the net discount rate 2%. In addition, I have allowed for loss of nurture and loss of support to age 21: not all children will need it until that time, but some may still be attending college at age 22 or 23; hence age 21 appears to be appropriate.

## D. DEATHS OF MAURICE CASON, STEVEN LINDQUIST AND ROGER JACKS

■ The survivors of these three young men are in substantially the same situation. Mr. Cason was 19 years old when he died; Lindquist and Jacks were both 20. Each of them was married. None of them had children.

Mr. Cason was a high school graduate. He planned to go to college after his enlistment, and had aspirations to become a pilot. At the time of his death he was classified as Engineman Third Class.

Mr. Jacks quit school after completing the tenth grade. He liked his Coast Guard assignment but planned a civilian career when his enlistment was over. He was classified as a Commissaryman Third Class when he died.

Mr. Lindquist had finished high school and one semester of college prior to his enlistment. In high school he had been an above average student. His future plans were uncertain but he did not plan to remain in the service. He was classified as Engineman Third Class.

Mrs. Cason, Mrs. Lindquist and Mrs. Jacks each impressed me as sincerely distraught. However, all of them are young and appear to have the emotional strength and resiliency to be expected at their ages.

The widows of each of these young men testified to services by her husband in the course of marriage. These were of the kind usually performed by a loving young husband, such as assistance around the house and help in shopping.

The monthly earnings of these three men at the time of their deaths were:

| | |
|---|---|
| Base pay | $137.70 |
| Quarters allowance | 60.00 |
| Clothing allowance | 6.90 |
| Allowance for sea duty | 9.00 |
| Total | $213.60 |

These would have been increased by a raise in base pay of $17.40 monthly on July 1, 1969, and $78.60 monthly effective January 1, 1971. Dr. Sliger also testified to likely future income of a greater amount in civilian employment after discharge from service.

There was evidence that for the sum of $93,780 a 20 year old female could purchase an annuity for life beginning at $200 per month and increasing at the rate of 3% a year.

While there are individual differences in each case, the preponderance of the evidence satisfies me that an award in the same amount should be made for Mrs. Cason, Lindquist, and Jacks. Accordingly, the following damages are fixed in each of these deaths:

| | |
|---|---|
| For loss of support and inheritable estate | $ 90,000 |
| For loss of services | .10,000 |
| For survivor's grief | 15,000 |
| | $115,000 |

## E. DEATH OF CHARLES D. MORRISON, JR.

 Mr. Morrison was a career Coast Guardsman, 31 years old when he died. He and his wife, Mrs. June Rodriguez Morrison, appeared to have had a happy marriage. They had 4 children, 2 boys and 2 girls. John 10, (who was adopted), Bonnie 9, Elise 6, and Chuck

3. Mrs. Morrison was 28 when her husband died.

Mr. Morrison was classified as a Commissaryman First Class when he died. He had a 10th grade education. He had planned to stay in the Coast Guard until he earned a pension and to retire when he had completed 20 years of service. After he retired, he planned to move to Tennessee and go in business with his father. At the time of his death his total pay and allowances amounted to $489.10. He gave all his earnings to his wife for the support of his family except $10 per pay day.

Dr. Sliger estimates his future earnings, including earnings from civilian employment after retirement from the Coast Guard and retirement benefits at about $309,000. For $86,300 an annuity could be purchased for a 28-year-old woman beginning at the rate of $200 monthly and increasing at the rate of 3% per annum. A like annuity beginning at $250 monthly would cost $107,950.

The following damages are awarded for Mrs. Morrison:

| | |
|---|---|
| Loss of support and inheritable estate | $100,000 |
| Loss of services | 10,000 |
| Emotional distress | 25,000 |
| Subtotal for Mrs. Morrison | $135,000 |

For John Morrison:

| | |
|---|---|
| Loss of support (at approximately $55 per month) * | $ 5,500 |
| Loss of nurture and guidance (at $300 per year) | 3,300 |
| For emotional distress | 5,000 |

For Bonnie L. Morrison:

| | |
|---|---|
| Loss of support (at approximately $55 per month) * | $ 6,000 |
| Loss of nurture and guidance (at $300 per year) | 3,600 |
| For emotional distress | 5,000 |

For Renesa L. Morrison:

| | |
|---|---|
| Loss of support (at approximately $55 per month) * | $ 7,500 |
| Loss of nurture and guidance (at $300 per year) | 4,500 |
| For emotional distress | 5,000 |

For Charles Robert Morrison III:

| | |
|---|---|
| Loss of support (at approximately $55 per month) * | $ 9,000 |
| Loss of nurture and guidance (at $300 per year) | 5,400 |
| For emotional distress | 5,000 |
| Total damages for death of Mr. Morrison | $199,800 |

* The net figures have been reduced to approximate present value.

### F. WALTON E. O'QUINN

■ Walton O'Quinn was an Engineman Third Class, aged 38. He was a career Coast Guardsman, but, in general, his record was below average. After his retirement, he planned to go into the welding business. He was married to Virginia O'Quinn in 1961, and they had one child, Cathleen Caprice, who was 2 years old when her father died.

Mr. O'Quinn had been married twice previously. He had one child by each of these marriages. One of them was over 21, and there is no evidence that she had any personal relationship with her father or suffered any grief as a result of his death.

Judith Ann, issue of the second marriage, was "about 14" at the time of the trial. She lived in Georgia, not with her father. Her father was devoted to her. There was no evidence, however, that he contributed to her support, or that she suffered any personal grief as a result of his death. He often talked about her and had her picture in his wallet. We are left to conjecture about her affection toward him or her loss as a result of his death.

Judith was adopted by Thomas F. DeLoach on May 2, 1967, two years before Mr. O'Quinn died. This adoption would terminate Judith's right to support. La.C.C. Art. 214, as amended; The Blackstock, decided by Judge Fred Heebe, Admiralty Action 66–47. However, we need not go so far here, for there was no evidence to show any loss by her as a result of her father's death.

In August 1967, Mrs. O'Quinn saw Walton for the last time, shortly before he left for Vietnam. When he returned from overseas duty, about a month before his death, he went to visit his parents in Georgia but did not see Mrs. O'Quinn or Cathleen Caprice.

While he was in Vietnam, his wife received his quarters allowance, $105 monthly. For a period of time, Mr. O'Quinn sent her $100 monthly in addition, but he discontinued this some months before his death. She testified that they had agreed he would save this until he returned. He wrote his wife while he was in Vietnam, but he sent home only some samples of Vietnamese currency.

There is considerable evidence that in the earlier years of their marriage Mr. O'Quinn contributed most of his earnings to the support of his family. However, this has little probative value with respect to the level of loss sustained as a result of his death because the relationship with his wife had apparently changed. Of course, the surviving spouse need not prove dependency to recover under D.O.H.S.A. Norris § 674. But to recover for her pecuniary loss, she must prove the amount of it by a preponderance of the evidence.

While Mr. O'Quinn was overseas, Mrs. O'Quinn and Cathleen Caprice lived with her sister in Cameron Parish. They had not established a household in New Orleans, where Mr. O'Quinn was stationed at the time of his death, nor was there any substantial evidence that they had a serious intention of doing so. The testimony that, after a tour of Vietnam, Mr. O'Quinn went first to see his parents and, having been in the states a month, had only spoken to his wife by telephone does not indicate that he was likely to resume the earlier relationship.

Mrs. O'Quinn appeared to have suffered some grief as a result of her husband's death, but there was no evidence of serious emotional distress. Accordingly, damages will be fixed as follows:

| | |
|---|---|
| For Mrs. O'Quinn (based on ⅔ of contributions being made on the date of death | $25,000 |
| Survivor's grief | 5,000 |
| For Cathleen Caprice O'Quinn: | |
| Loss of support (based on ⅓ of the contribution being made by her father) | $ 8,500 |
| Loss of parental nurture and guidance (at $300 per year) | 5,700 |
| Total | $44,200 |

### G. DEATH OF RICHARD DUNCAN, WALTER ABBOTT III, GUY T. WOOD, LARRY V. FREGIA, JOHN R. COOPER, JR.

■ None of these young men were married. They were each survived by

their parents. The surviving parents testified, and I am convinced that each of them have suffered, and continue to experience true grief. That money cannot compensate them goes without saying. But neither can it repay for the pain of those who live and suffer or restore the limbs of those whose loss is equally immeasurable in currency. That human life cannot be accurately weighed in coin does not mean it must be considered valueless.

The grief of each parent is individual and different. But in most instances I cannot measure it so accurately as to distinguish the amount suffered by one parent substantially from that of another. Accordingly for A. B. Duncan, Mrs. Vanetta Duncan Chambers, Walter Abbott, Jr., Mrs. Sally Dix Baker, Mrs. Lenna P. Smallwood, Virgil Fregia, Mr. John Cooper and Mrs. John Cooper, I award the sum of $20,000 each. I am convinced that Mrs. Fregia suffered particularly acute distress, and I award her the sum of $25,000.

Counsel for the individual claimants will prepare an interlocutory decree. Judgment will not be entered until all other damages have been determined.