See also, D.C., 378 F.Supp. 1354.

Complaint of **FARRELL LINES INCORPORATED**, Owner of the **STEAMSHIP AFRICAN NEPTUNE**, for Exoneration from or Limitation of Liability.

Claim of **Mrs. Betty JOHNS**, Individually, and as Administratrix of the Estate of **Kelly Johns**, for Personal Injuries, Damages and for the Wrongful Death of her husband and two infant sons.

Civ. A. No. 3033.

United States District Court,
S. D. Georgia,
Savannah Division.

Jan. 7, 1975.

195

Campbell & Keating, New York City, for Farrell Lines Inc.

Leon A. Wilson, II, Benjamin Smith, Jr., Waycross, Ga., for claimants. ·

LAWRENCE, Chief Judge.

## I

### Background of the Claim

Shortly before eight o'clock on the night of November 7, 1972, a Chevrolet occupied by six persons was crossing the Sidney Lanier Bridge. It spans the Brunswick River below Brunswick, Georgia. The car was driven by Kelly Johns, aged twenty-three. His wife Betty was seated next to him. In her lap was their two year-old son, Arthur Lewis. In the rear were seated Doris Ann Smith, aged sixteen, and her grandmother, Delia Johns.[1] Kelly Johns, Jr., aged three, was between them.

It was Election Day and Leon Smith, the husband of one of Mrs. Delia Johns' daughters, was running for Sheriff of Glynn County. Delia and Kelly Johns, his wife Betty and their two children had driven over from Waycross that afternoon. That evening the Johns clan had gathered at the home of the candidate on Jekyll Island. When the occasion was over, Kelly with the five occupants of the car started back to Brunswick.

On reaching the bridge, the lift span was open in order to permit the passage of a vessel seaward. Kelly drew up in the line of traffic. He stopped south of the opening. Betty Johns was taking a nap. Kelly waked her. "Look at the big ship." She looked and fell asleep again. A few moments later, she reawakened. "Y'all hold on. The bridge is falling!" shouted her husband. The steamship "African Neptune" had missed the opening. She struck the bridge 250 feet south of the southernmost lift span tower.

The Johns car plunged into the Brunswick River. Before it hit the water,

Julian C. Sipple, Gustave R. Dubus, III, Chamlee, Dubus & Sipple, Savannah, Ga., Richard H. Brown, Jr., Kirlin,

[1]. We have previously met Delia Johns in the "African Neptune" litigation. See the decision of this Court in the claim for her death. The amount of $72,000 was awarded to Delia's four children for the loss of her love, affection, services and companionship.

Betty opened the door next to her and managed to get out before the car submerged, clutching her two year-old. The current was strong. She tried to hold on to her son but was not able. He drowned. She was picked up by a boat.

Meanwhile, her husband freed himself from the car and reached the surface. His mother and his three year-old son were still under water. According to Doris Ann Smith who had gotten out of the car through the left front window, Kelly dove down but "never did surface after that". His body was recovered four days later along with that of Kelly Johns, Jr. Doris Ann was saved.[2]

The claim of Betty Johns for the death of her husband and two infant sons and for her own injuries and damages runs the scale of the various elements of recovery permitted in wrongful death claims under general maritime law as developed in Sea-Land Services, Inc. v. Gaudet, 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 and the cases decided subsequently to the Supreme Court's ruling in Moragne v. States Marine Lines, 398 U. S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339.[3] Once more, this Court faces the task of evaluating the life of a decedent and fixing compensation for injuries or damages growing out of the collision of the "African Neptune" with the Sidney Lanier Bridge. Evidence in the claim was heard before this Court on December 9th–10th, 1974.

## II

*Claim of Mrs. Johns for loss of support and society of her deceased husband*

In Sea-Land Services, Inc. v. Gaudet, 414 U.S. at 585, 94 S.Ct. at 814 the Supreme Court in fashioning the remedy

and the elements of recovery for the new wrongful death remedy under general maritime law, stated that "the members of the decedent's dependents may recover damages for their loss of support, services, and society . . . ."

Such recovery, the Court continued (at 586, 94 S.Ct. at 814), "has been universally recognized, and includes all the financial contributions that the decedent would have made to his dependents had he lived. Similarly, the overwhelming majority of state wrongful death acts and courts interpreting the Death on the High Seas Act have permitted recovery for the monetary value of services the decedent provided and would have continued to provide but for his wrongful death. . . . Services the decedent performed at home or for his spouse are also compensable. . . ."[4]

### (A) *Background of life of Kelly Johns and his earnings history*

At the time of his death decedent was twenty-three years old. His wife was two years younger. They had been married for four years. Betty dropped out of school in the ninth grade. Kelly did not finish the twelfth grade of high school. He served two years in the Army, part of it in Vietnam, and was married four months before his discharge. On his return to Waycross, Kelly Johns held two or three jobs. He worked for a time in sales for the Coca-Cola Bottling Company in that city, earning $60.00 to $65.00 per week. For a short period in 1971 he was employed as a warehouseman by the wholesaler of Budweiser beer in Waycross.

While his health appears to have been good, he suffered from back trouble and

---

2. Her claim for physical and mental pain and suffering was settled after evidence was heard by this Court on December 9, 1974.

3. In respect to the measure of damages applicable in this litigation and the decision of this Court denying limitation of liability by the shipowner, see Complaint of Farrell Lines Incorporated, Owner of the Steamship African Neptune, 378 F.Supp. 1354.

4. In Moragne v. States Marine Lines, 398 U. S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 the

Supreme Court recognized a remedy for wrongful death under general maritime law. In opposing the overruling of The Harrisburg, 119 U.S. 199, 7 S.Ct. 140, 30 L.Ed. 358, respondents argued that it "will necessitate a long line of decisions to spell out the elements of the new 'cause of action.'" The Supreme Court replied, "We believe these fears are exaggerated." 398 U.S. at 405, 90 S.Ct. at 1790. They were not exaggerated.

in the early part of 1971 underwent an operation to correct a herniated disc. Upon recovering, he went to work again for the Budweiser distributor as a route salesman and was given a newly established route. Johns received a commission of thirteen cents per case sold by him. He was guaranteed a minimum compensation of $75.00 a week but his commissions exceeded that amount during the short time he was employed as a driver-salesman by the beer distributor. He worked three days a week which was sufficient to cover the route to which he was assigned.

His employer, William L. Raleigh, testified that Kelly was a good salesman; knew the people in Waycross; was industrious; well-liked; reliable, and did not drink. His *net* earnings during his short connection with the business in 1972 were as follows:

| | |
|---|---|
| August | $520.02 |
| September | 363.68 |
| October | 336.88 |

(Note: the beer business is seasonal and August is normally a good month for sales).

After the death of Kelly Johns, the business on his former route increased. The salesman who succeeded him earned gross commissions from March, 1973– March, 1974, totalling around $7,350. An employee who handled the route in 1974 had gross earnings from March, 1974, through November, 1974, of $7,673.85. It appears likely that had Kelly Johns lived he would have obtained comparable results in increasing sales on the route in question.

Mr. Raleigh testified that the maximum earnings of a route salesman would be $13,000 to $14,000 per year. He was of the opinion that Johns had the capacity, with training, to go on to the position of supervisor or even manager, if an opening came. In management he could earn up to $22,000 annually. Raleigh further testified that he had Johns in mind as supervisor of the Hinesville route after it was expanded to serve that new area. As such, his earnings would be $14,000 to $15,000. Employees received a Christmas bonus of $200 to $500. The employer also contributes 60% to the premium costs of a life insurance-hospitalization policy.

Kelly Johns turned over his pay checks to his wife. While his earnings were small, he and Mrs. Johns somehow seem to have made ends meet. They had their own household. The widow testified that her husband performed many services of value around the house such as carpentry, repair of plumbing, painting, etc.

What are the probable earnings of Kelly Johns during his working years had he lived? As to life expectancy, claimant relies on the Annuity Mortality Table for 1949 which predicts an expectancy of 49.41 years for a male of Kelly Johns' age and 56.50 years for a female 21 years old. Other Tables in the Georgia Code show expectancies of approximately 40, 43 and 47 for a 23 year-old man and five years longer for a woman of the same age. For purposes of future earnings, claimant ends the worklife expectancy of Johns at the age of 65. However, recovery for loss of society, affection, services, etc. is based on an anticipated life expectancy of 49.41 years.

(B) *Pecuniary Damages to Widow As Result of Loss of Support*

██ Counsel for Mrs. Betty Johns contends that the average gross income[5] of her husband per year over his worklife expectancy would be $9,840.72.

---

5. Income taxes are not deductible from future gross earnings unless the annual estimated earnings are clearly above the reach of the middle income scale. Petition of M/V Elaine Jones, 480 F.2d 11, 28 (5th Cir.); Higginbotham v. Mobil Oil Corporation, 360 F.Supp. 1140, 1149 (W.D., La.). See also Blue v. Western Railway of Alabama, 469 F.2d 487 (5th Cir.), cert. den. 410 U.S. 956, 93 S.Ct. 1422, 35 L.Ed.2d 688.

In the instant case the predicted earnings of the decedent are well within the middle income range.

6. Claimant apparently does not seek compensation for loss of social security benefits after attaining the age of sixty-five. Generally, loss of a pension or social security benefits is a factor in calculating monetary loss in wrongful death cases. 22 Am.Jur.2d

Multiplying this figure by forty years results in total gross income during such period of approximately $394,000.[6]

■ The gross amount of future lost earnings would have to be reduced to present value. Higginbotham v. Mobil Oil Corporation, *supra*, 360 F.Supp. 1149; Complaint of Farrell Lines Incorporated, *supra*, 378 F.Supp. 1359; Petition of M/V Elaine Jones, *supra*, 480 F. 2d 29. Further, from gross future earnings there would have to be deducted the personal expenses of the decedent had he lived. See Complaint of Farrell Lines, *supra*, 378 F.Supp. at 1359; In re Sincere Navigation Corporation, 329 F. Supp. 652, 659 (E.D., La.).

■ In calculating the probable future earnings of Mr. Johns one must consider, along with the prospect of increased earnings in his prime years, educational limitations, lack of any skill or specialty and want of revealed promise of managerial or executive ability. One must also take into consideration the fluctuation of earnings due to hard times, health, and diminished earning capacity in later life.

Estimating a decedent's average annual income and predicting his life expectancy is a venture into the realm of guesswork and prophecy. This Court has reached the conclusion that an average estimated yearly income of $9,500 over a forty year period is not out of line. Such amount will represent income of all kinds, including bonuses and fringe benefits. The award does not ignore future inflationary or deflationary trends. On that subject, see Johnson v. Penrod Drilling Co., 469 F.2d 897 (5th Cir.)*; Petition of M/V Elaine Jones, *supra*, 480 F.2d at 28, note 11B; Higginbotham, *supra*, 360 F.Supp. at 1150.

Average annual earnings in the sum of $9,500 multipled by forty years gives a gross income of $380,000 over his anticipated work-life had he lived. From that sum his estimated personal living expenses must be deducted. In re Sincere Navigation Corporation, *supra*, 329 F.Supp. at 659. In awards under the Death on the High Seas Act deductions for expenses have been made for food, clothing, pocket money, mortgage payments and cost of public utilities. See 16 A.L.R.Fed. § 21 at p. 717. Under general maritime law, courts have used percentages ranging from 15% to 41⅔%. See for example, Neal v. Saga Shipping Co., S.A., 407 F.2d 481, 488 (5th Cir.) and In re Sincere Navigation Corporation, *supra*.

I find that 20% is a fair allocation for personal living expenses of Mr. Johns' estimated earnings. Thus reduced, the decedent's predicted future gross earnings to the age of sixty-five would be $304,000. This amount has to be reduced to present cash value. In doing so, I have used an interest basis of 5% per annum which accords with Georgia law in wrongful death cases. See Ga.Code Ann. § 38–217.

■ The commuted value of the future earnings of Kelly Johns is $130,409.05 and judgment will be entered in that sum for the loss-of-earnings element of damages over a forty year period beginning in 1975.

(C) *Loss of Earnings from Date of Death to January 1, 1975*

■ Claimant seeks recovery of the loss of probable earnings of her husband from November 7, 1972, to December 9, 1974 (date of trial) in the amount of $16,232.20. I find that the gross earnings of decedent during the period from his death to January 1, 1975 (111 weeks) would reasonably have approximated $15,000. The loss of past earnings less decedent's personal living expenses comes to $12,000.

Death § 157; Higginbotham v. Mobil Oil Corporation, *supra*, 360 F.Supp. 1140. However, this would permit to an extent a double recovery in view of the non-deduction from gross income of decedent's social security contributions.

* Since the decision in the instant case, the Fifth Circuit has ruled on rehearing en banc

in Johnson v. Penrod Drilling Co. that possible future inflation is not to be considered in the present rule for calculating future damages. 510 F.2d 234. To the same effect, see Law v. Sea Drilling Corporation, 510 F. 2d 242 (5th Cir.).

**(D)** *Widow's Loss of Love, Affection, Society, Services, etc. of her Husband*

■ The claim of Mrs. Johns for this element of damage is made on the basis of a hypothetical life span of 49.41 years. The end of that period would be the year 2,021 A.D. The widow's longevity is relevant. Loss of love and affection, companionship, and services would cease at the death of either spouse. The factor of the joint life expectancy of the couple is involved. See Walden v. Coleman, 105 Ga.App. 242, 124 S.E.2d 313. I fix forty years as the period beyond which loss of society, affection and services will not be considered.

■■ The value of these elements of damage cannot be mathematically measured. It is left to the sound discretion of the trial court and is to be determined in accordance with all the facts and circumstances of the case. I conclude that $2,500 per annum is reasonable compensation for the loss of decedent's love, affection, society, companionship, care, comfort, protection and services.[7] The total award therefor is $105,000. Such amount does not have to be reduced to present value. See City of Macon v. Smith, 117 Ga.App. 363, 374, 160 S.E.2d 622; United States v. Harue Hayashi, 282 F.2d 599, 605 (9th Cir.).

**(E)** *Damages for conscious pain and suffering experienced by Kelly Johns*

■ Damages are recoverable under general maritime law for conscious pain and suffering of a decedent. Dennis v. Central Gulf Steamship Corporation, 453 F.2d 137, 140 (5th Cir.); Petition of M/V Elaine Jones, 480 F.2d 11, 30–31

(5th Cir.). I dealt with the same subject in the claim by the administratrix of Mrs. Delia Johns. The final earthly moments of her son Kelly must have been equally horrendous.[8]

■ The sum of $6,000 is awarded to the Administratrix as damages for the conscious pain and suffering of Mr. Johns.

### III

*Damages for death of infant sons of Betty Johns*

Kelly Johns, Jr. was three years and four months old at the time of his tragic death. His brother Arthur was two years and three months. Both were normal, healthy children. What is the dollar value to the mother of lives snuffed out when they had scarcely begun? Based upon her claimed life expectancy and calculating the loss of earnings and value of the society and services of each child at $5,000 per year, Mrs. Johns seeks damages totalling $410,000 for the death of her sons.

Little case law has followed in the wake of *Moragne* as to the measure of damages for wrongful death of minor children. A trial court has held that the recoverable damages in such cases are loss of support; loss of love and affection; funeral expenses, and conscious pain and suffering. In the Matter of Complaint of Farrell Lines, Incorporated, as Owner of the Steamship African Star, 339 F.Supp. 91, 94 (E.D., La.).[9] On the subject of damages for wrongful death of infants see generally, 22 Am. Jur.2d Death § 147; 14 A.L.R.2d 485–559; Leonard Decof, "Damages in Actions for Wrongful Death of Children", 47 Notre Dame Lawyer (Dec., 1971),

---

7. The performing of services by a husband in and around the home has a pecuniary value. No direct evidence was offered as to the worth thereof. However, I have taken this element of damage into consideration and have awarded damages therefor in the amount of $5,000.

8. "Lord, Lord! methought, what pain it was to drown: What dreadful noise of waters in mine ears! What ugly sights of death within mine eyes!" Richard III, Act I, Scene 4.

9. In that case the decedent who was nineteen years old and unmarried contributed support to his parents. The Court awarded them approximately $19,000 for loss of support and $50,000 for loss of the love and affection of their son.

197; "Damages for the Wrongful Death of Children", 22 University of Chicago Law Review (1955), 538.

My recollection of the claim for the death of Delia Johns is that none of her sons gave their mother financial help either before or after they became of age or were married. Nothing in the claim of her daughter-in-law Betty suggests any different situation or prospect in the event her sons had lived to maturity. They would predictably have rendered services of pecuniary value to their parent. A more important element, however, is the loss of the love, society, help and advice of her sons—the amalgam of filial companionship and comfort which is a significant element of recovery in wrongful death cases. Mrs. Johns' loss is compounded by her widowed state.

The author of the article referred to in University of Chicago Law Review concludes (p. 550):

> "The aphorism that it is cheaper to kill a child than to kill an adult would retain its paradoxical sting of truth, yet the candid recognition of real emotional harm in the child death situation by an award of substantial, though limited, damages would constitute a more civilized solution to a perplexing damage problem."

 "The death of a child," the same writer says, "is the greatest of all losses—impossible of compensation—and yet at the same time an economic saving to the family involved." p. 538. Probable rearing expense is a reductive factor in calculating the loss to parents in the way of pecuniary services and financial contributions by a deceased child. 22 Am.Jur.2d § 147; 14 A.L.R.2d 485, 502. So is the probability of marriage. 16 A.L.R. Fed. 711–712.

There are no mathematical formulae or fixed principles for evaluating loss of love and of society of infants. The facts cannot be programmed into a computer to produce an arithmetic result. As I stated in considering the loss of society, services and companionship in the claim of Mrs. Delia Johns:

> "It is not an easy task. A judge confronted with it can only address himself to the problem conscientiously, with an eye to the evidence and the law, deciding as best he can what is compensatory to the plaintiff without being punitory to the wrongdoer—minimizing, to the extent practicable, the speculative element inherent in measuring such damages."

 This Court finds that the pecuniary damage to Betty Johns in the way of loss of services and deprivation of the love, society and comfort of her two sons is $75,000 in each case—a total of $150,000 in damages for the wrongful death of Kelly Johns, Jr. and Arthur L. Johns.

IV

*Claims of Mrs. Betty Johns for pain and suffering, mental and physical, loss of potential earnings, and expenses and property damage*

 (A) Shock and fright are compensable in damages where attended with actual immediate physical injury. Central of Georgia Railway Company v. Barnes, 46 Ga.App. 158, 160, 167 S.E. 217; Candler v. Smith, 50 Ga.App. 667, 179 S.E. 395; Usry v. Small, 103 Ga. App. 144, 118 S.E.2d 719; 25 C.J.S. Damages § 70. The facts in the present case satisfy the physical injury factor underlying compensation for shock and terror. Within two or three minutes after the car plunged from the bridge her youngest boy slipped from her grasp and into eternity. Meanwhile, somewhere below was her other son and her mother-in-law. Her husband had gone back down to look for them. Her own life was imperilled.

In a case decided in Connecticut in 1973 it was held that the shock to parents of seeing their child killed in an automobile in which they were riding is compensable in damages as a reasonably foreseeable and direct consequence of the tortious act of another. D'Amicol v. Alvarez Shipping Co., Inc., 31 Conn.Sup. 164, 326 A.2d 129. The Court relied to

some extent on Dillon v. Legg, 68 Cal.2d 728, 69 Cal.Rptr. 72, 441 P.2d 912 and, in turn, the California court was influenced by Harper & James, The Law of Torts, vol. 2, pp. 1035–1036, 1039.

■ Mrs. Johns is entitled to recover damages for pain and suffering, mental and physical. Compensation therefor includes the anguish and terror in witnessing the drowning of her husband and children.

### (B) Psychological effect of tragedy on Mrs. Betty Johns

Betty Smith Johns married at the age of seventeen. She possesses little experience in the workaday world. Since the death of her husband and children, she has lived with her parents in Waycross. Her father who was employed by King Edward Cigar Company obtained work for her at its plant in that city. She was unable to concentrate and gave up her job after about two months. For a time she tried to become a beautician. She quit when she had to practice on a corpse.

Her father describes her as "an emotional wreck". According to her mother, Betty is "terribly depressed". She spends a great deal of time at the cemetery. She has twice attempted suicide, according to Mrs. Smith.

Dr. Ivey Jacobs of Waycross, an ENT specialist, noted a marked change in Mrs. Johns' personality when he saw her on November 30, 1972. He had treated her for her ear condition since 1967. Betty had been an outgoing person, easy to communicate with and well-adjusted. He found her depressed and she became more so as time went on. Jacobs deposition, 8–9. She was sad-looking, "withdrawn, doesn't talk," and made no attempt to carry on any conversation with the girls in the office. According to Dr. Jacobs, she had "a blank type expression

you get from people who's depressed". Deposition, p. 13.

At home Betty helps out with cooking and with the dishes, does some needlework, and occasionally goes shopping with her sister. Other than this limited activity, she has almost completely withdrawn herself from the outside world.

Apparently Mrs. Johns has not had the benefit of psychiatric treatment. Perhaps no physician can minister to her ills. However, there is an absence of medical testimony in the way of diagnosis of her condition, cause, effect and prognosis.

■ Under general maritime law, damages are not recoverable for grief of the family for loss of a loved one. It is distinguishable from mental anguish and loss of society. Gaudet, 414 U.S. n. 17 at 585, 94 S.Ct. 806; Petition of M/V Elaine Jones, supra, 480 F.2d at 33–34; McDonald v. Federal Barge Lines, Inc., 496 F.2d 1376 (5th Cir.).

Modern legal authorities point in the direction of liability for psychological disorder which is the foreseeable result of injury or shock immediately connected with the tortious act.[10] In this connection, see 38 Am.Jur.2d Fright, Shock, Etc. § 37; 25 C.J.S. Damages § 67. In 2 Restatement of the Law Second, Torts § 436 it is said in respect to recovery for physical harm resulting from emotional disturbance:

> "(2) If the actor's conduct is negligent as creating an unreasonable risk of causing bodily harm to another otherwise than by subjecting him to fright, shock, or other similar and immediate emotional disturbance, the fact that such harm results solely from the internal operation of fright or other emotional disturbance does not protect the actor from liability.
>
> "(3) The rule stated in Subsection (2) applies where the bodily harm to

---

10. "In recent years there has been a marked tendency in the common law states to expand the concept of damages recoverable for wrongful death to embrace some measure of compensation for the emotional suffering of survivors." In re Sincere Navigation Corporation, supra, 329 F.Supp. 652, at 655.

the other results from his shock or fright at harm or peril to a member of his immediate family occurring in his presence."

This is an appropriate case for application of these principles of the law of torts with, however, an added dimension. The nightmarish experience of Mrs. Johns has apparently progressed into prolonged depression. If this psychological condition is in reality grief over the loss of loved ones, *Gaudet* denies any recovery. It is next to impossible to distinguish between grief over a lost one and psychological injury to a survivor who is present at and was part of the tragic event. Mrs. Johns is only twenty-three. Time is a skilled apothecary to personal tragedy.

The "survivor's grief" exception as an element of damage is a rein on runaway awards in wrongful death cases. But the reins are dropped when a survivor is permitted to recover damages for mental depression and inability to hold a job where the main source of despondency is grief, sorrow and self-pity.

 However, the psychological effects of the bereavement and the harrowing experience have persisted for over two years and are not wholly the result of grief. A compensatory award in some amount is in order.

(C) *Claim of aggravation of preexisting ear trouble and increased hearing deficiency*

Betty Johns has had a long history of ear trouble. In 1963 at the age of twelve she underwent a radical right mastoidectomy by Dr. Richard C. Parsons in Atlanta. The case history shows that the ear had been draining for about three years. "Her hearing is poor, she has a bone conduction hearing aid for past year." The following year a similar operation and a tympanoplasty (rebuilding ear to the normal structure) was performed by the same specialist for chronic left mastoiditis.

Mrs. Johns claims that the ear infection was reactivated by her immersion in the Brunswick River. In 1973 she re-

turned to Dr. Parsons for treatment, complaining that both ears had been draining since that episode and that treatment by a local physician had not stopped it. Dr. Parsons cleaned out the mastoid cavities and removed the debris that tends to accumulate. Parsons deposition, pp. 12, 36. He said (pp. 6–7) that mastoidectomies are prone to the bringing on of problems "for the rest of the patient's life" and require periodic care and follow-ups.

The mother of the claimant testified that her daughter's hearing is "much worse" since the accident. According to Dr. Ivey Jacobs, the hearing impairment prior to November, 1972, was 60% (without a hearing aid). He is of the opinion that after that time the deficiency increased by 20%. Jacobs deposition, 8, 12. Dr. Jacobs had treated Betty intermittently for the purpose of cleaning out the mastoid cavities from September, 1967, until April, 1972. Beginning in December, 1972, through October, 1973, Mrs. Johns paid monthly visits to his office.

Previously the patient had a "good, dry mastoid cavity". Deposition, 6–8. When Dr. Jacobs saw her on November 30, 1972, there was a foul-smelling discharge from both mastoid cavities and greater hearing loss than had existed before. He was unable to clear up the discharge "and she got more and more depressed". Deposition 10. He had instructed Mrs. Johns to keep water from getting into her ears. Deposition, 11. "[Y]ou're going to get an infection, if she's got a cavity like she's got, any time you get water in it." Deposition, 11.

Dr. Jacobs concludes that as a result of "her depression and her inability to take care of her ears, to follow instructions, is probably the reason this hasn't cleared up." Deposition, 24. In his opinion, in order to obtain an improvement in hearing, additional surgery will be necessary. Deposition, 14–15.

This Court concludes from the evidence before it that some deterioration in the hearing capability of Betty Johns occurred after November 7, 1972. It is

also reasonably inferable that the ear infection observed by Dr. Jacobs when he examined claimant at the end of that month was connected with the patient's exposure to water. On the other hand, this Court is unable to say from the evidence to what extent the immersion increased the substantial existing hearing impairment. It certainly seems to have developed rapidly since it was noted by the specialist three weeks after the Bridge disaster. It may well have been that the additional deficiency in hearing occurred as the result of the renewed infection from water getting into Mrs. Johns' ears. However, the evidence tends to show that Dr. Jacobs' inability to clear up the infection and discharge resulted from her failure (or inability) to follow instructions as to care.

Compensation in some amount is in order in respect to aggravation of the preexisting ear trouble.

*Award of damages to Betty Johns for personal injury and mental pain and suffering and anguish*

I find that Mrs. Johns is entitled to recover $50,000 as compensation for the elements of damages discussed in Division IV (A), (B) and (C) of this Order. It is not necessary to itemize the components of such award. Neal v. Saga Shipping Co., S.A., *supra*, 407 F.2d at 489.

(D) *Claim for loss of potential earnings by Mrs. Johns as result of injuries*

Using a minimum wage basis over a work expectancy of 40⅓ years, loss of earnings by Betty Johns is claimed in an amount approximating $205,000.

Prior to the loss of her husband and children, Mrs. Johns' experience as a wage earner was almost nonexistent. In 1973 she obtained a job with King Edward Cigar Company but could not hold it because of lack of concentration due to mental depression and other factors. She gave up training as a beautician because she was disturbed at having to learn the trade on a corpse, as previously noted.

It is possible that the aggravation of Mrs. Johns' hearing disability will handicap her in obtaining gainful employment if she makes any further attempt in that respect. However, she already suffered from a marked hearing deficiency. While her business inexperience and lack of any vocation will be a factor in inability to work, the dominant obstacle is the depressed mental state and attitude toward life in general—"nothing to live for". This has its source in grief and sorrow more than in physical injury or psychological problems directly connected with an injury.

Damages in the way of future loss of earnings to Mrs. Johns' case is highly speculative. This Court will not render an award therefor beyond 1975. I find that the maximum income in the way of earnings lost by claimant as a proximate result of the injury and the experience of November 7, 1972, is $7,500 for the whole of the period of 1973–1975.

(E) *Expenses and property damage*

Counsel for Farrell Lines have not quibbled over the fact or amount of the funeral and other expenses and the property damage sustained by the Estate of Kelly Johns and by Mrs. Betty Johns personally. They total $5,742.31. The expenses and the property damage consist of the following:

| | |
|---|---|
| Hearing Aid | $350.00 |
| Glynn-Memorial Hospital | 162.75 |
| Dr. Ivey Jacobs | 125.00 |
| Automobile | 1,000.00 |
| Funeral Kelly Johns | 1,530.18 |
| Funeral Kelly Johns, Jr. | 811.93 |
| Funeral Arthur Lewis Johns | 766.45 |
| Monument | 996.00 |

## V

(A) *Claim of Kelly Johns, deceased, through his Administratrix, for damages for wrongful death of his infant sons Kelly Johns, Jr. and Arthur Lewis Johns*

(B) *Claim of Kelly Johns, Jr. and Arthur Lewis Johns, deceased, through*

*their Administratrix, for death of their father, Kelly Johns, Sr.*

(C) *Conscious pain and suffering of infant children*

(A) and (B) Where a father and two sons lose their lives in a common disaster, is the surviving mother the only person who can recover damages for wrongful death or can the father's administrator recover for the death of the two children and the deceased sons, through the personal representative, recover for the loss of the society, support, guidance and nurture of their parent?

This question was anticipated by this Court in its pretrial order in the matter of Farrell Lines, Incorporated, 378 F. Supp. at 1360. Letters of administration were issued to Mrs. Johns on the estates of Kelly L. Johns, Jr. and Arthur L. Johns. However, it turns out that this aspect of the claim is not pressed by the Administratrix. The only recovery sought by her in that capacity is for the conscious pain and suffering of the two infants before their death.

If the problem faced this Court, the answer would have been in the negative as to recovery by the children's administratrix for the wrongful death of their father and by the father's administratrix for the death of his sons. The *Gaudet* remedy for wrongful death contemplates compensation to survivors, not to the dead for the dead. The Death on the High Seas Act compensates beneficiaries "for losses actually suffered. . . . Thus, the death of a beneficiary limits the period for which an award can be made". Petition of the United States as Owner of the Coast Guard Vessel CG–95321, 418 F.2d 264, 272 (1st Cir.). Where the widow of a seaman died a year after her husband's death, her "pecuniary loss is limited in duration and extent to her lifetime". The City of Rome, 48 F.2d 333, 342 (S. D., N.Y.). See also 25A C.J.S. Death § 40, p. 696; 22 Am.Jur.2d Death § 70, p. 654.

However, as noted above, the Administratrix appears not to be pressing the issue. It is unnecessary to decide the question and this Court does not belabor it further.

(C) *Conscious pain and suffering of the Johns children preceding drowning*

No evidence was offered in this respect. While an eyewitness account is unnecessary to recovery in such cases, there must be evidence to support a finding that pain and suffering was experienced by the decedent. Petition of United States Steel Corporation, 436 F.2d 1256, 1275 (6th Cir.), cert. den. Lamp v. United States Steel Corp., 402 U.S. 987, 91 S.Ct. 1649, 29 L.Ed.2d 153. I am unable to conclude that in the instance of two and three year-old children, consciousness has developed to the point of capacity of awareness or perception of events preceding death.

Recovery of damages is denied for conscious pain and suffering of the infants during the period between the collision and their death.

## VI

*Recapitulation of damage awards to Mrs. Betty Johns, individually and as Administratrix of Kelly Johns*

(I) Death of Kelly Johns
 (a) Future loss of earnings from January 1, 1975 ........ $130,409.05
 (b) Loss of earnings to January 1, 1975 ......... $ 12,000.00
 (c) Loss to widow of love, society and services ....... $105,000.00
 (d) Conscious pain and suffering .............. $ 6,000.00

(II) Death of two infant sons
 (a) Kelly Johns, Jr. .......... $ 75,000.00
 (b) Arthur L. Johns .......... $ 75,000.00

(III) Awards to Mrs. Betty Johns for personal injury; mental pain and suffering; loss of earnings; expenses and property damages
 (a) Personal injuries and mental and physical pain and suffering ................. $ 50,000.00
 (b) Loss of potential past and future earnings by Mrs. Johns ................. $ 7,500.00
 (c) Expenses and property ..... $ 5,742.31

 Total $466,651.36

Award of pre-judgment interest under general maritime law lies in the discretion of the trial judge. Den-

nis v. Central Gulf S.S. Corp., 453 F.2d 137 (5th Cir.), cert. den. 409 U.S. 948, 93 S.Ct. 286, 34 L.Ed.2d 218; Higginbotham v. Mobil Oil Corp., *supra*, 360 F.Supp. at 1150; Doucet v. Wheless Drilling Co., 467 F.2d 336 (5th Cir.); Weeks v. Alonzo Cothren, Inc., 5 Cir., 493 F.2d 538; 18 A.L.R. Fed. 212–213. The expense items ($5,742.31) will bear interest at 6% per annum from November 7, 1972. In the exercise of its discretion, this Court declines to allow prejudgment interest as to any other items recovered. Post-judgment interest will be at the State rate of 7% per annum. See 28 U.S.C. § 1961.

Let judgment be entered accordingly.